Nott, Ch. J.,
delivered the opinion of the court:
Actions founded upon patented inventions fall into three classes.of cases: First, ordinary suits for infringement, which are in their nature ex delicto and of which jurisdiction is to be found exclusively in the Federal courts; second, actions on express contracts for the purchase and sale of inventions either to the full extent of the patent or for some limited user of the invention, which are as purely ex contracto as other actions for the purchase and sale of other property. Of these cases State courts have jurisdiction. Third, actions on implied contracts for the taking and user of an inventor’s property where the circumstances were such as to imply that the defendant did not intend to do an unlawful act, and that the claimant consented to the taking. These cases have so far appeared only in suits against the Government.
This is the first patent case which has come into this court founded upon an express contract. As a number of other patent cases came before the court about the same time this, with the others, has been held for more than ordinary consideration.
All of the cases which have hitherto come before the court *682 have been founded apon implied contracts. In such cases all defenses were open to the defendants — the Government— which are open to ordinary defendants .in ordinary actions for infringement. They could set up another-title, a license under another antecedent patent; they could attack the validity of a patent, and show that the invention which they apjTropriated was not property; they could maintain that the device which they manufactured differed in essential particulars from the device which the inventor had protected by letters patent; they could show facts negativing’ a presumption to claim a royalty, such as, in actions for infringement, come under the designation of “implied license.” In a word, they could always treat such suits — and, in fact, their counsel always have treated such suits — as if they were actions for infringement. In the proffer of evidence and the earnestness of argument the distinctions between actions ex delicto and actions ex con-tracto have repeatedly been lost sight of. It is therefore not surprising that this suit has been defended (and with great ability) precisely as have all the other's which have gone before it. But the court, nevertheless, must now consider whether its duties extend further than declaring and determining the contractual rights and obligations of the parties.
In 1890 the Government, like the governments of all other countries, was unable to manufacture or procure properly hardened plates for armored vessels. It was in this dilemma: That if the plates were sufficiently heavy to withstand an ene-rajCs shots, they would sink the vessel; and if they were sufficiently light to leave the vessel a floatative, manageable marine machine, they could be penetrated or shattered by an enemy’s guns. In other words, artillery was then in advance of defensive armor. Such being the case, the inventor of the Harvey process went to the Chief of Naval Ordnance and informed him that he had discovered a process whereby the ideal combination of an exceedingly hard surface with an exceedingly tough interior could be obtained. The assertion was tested by two.of the severest practical tests that could be devised. Two hardened plates were procured from a manufacturer. One was retained by the Bureau of Ordnance; the other was hardened by the Harvey process; both were subjected to the same artillery fire. Under this test the one *683 plate was destroyed and the other uninjured. So far the superiority of the Harvey plate over one of approved manufacture was established, but it was wisely deemed by the Ordnance Bureau that the Harvey plate should be compared with one which was regarded in Europe as superior to all others. Accordingly, two of the then celebrated Creusot plates, made by renowned manufacturers — Schneider & Co. — were imported by the Ordnance Bureau. One was retained as before and one was given to the claimant, and both were subjected to the same artillery fire, and with like results. They indicated, said the Chief of Ordnance in his report to the Secretary of the Navy, “Thatin this treatment has been found the means of producing the ideal armor plate — a hard front combined with a tough back, without any weld or other line of demarkation between the two.” These were the facts and circumstances in the light of which the express contract of March 21, 1892, was entered into.
By this contract of March 21; 1892, it was agreed that the “ Harvey process” should be used in the treatment of armor plates to be manufactured for certain designated vessels, and that a royalty at certain rates “per pound” should be paid. The manufacture of such plates went on until the royalty amounted to $96,056.46. This contract has no particular bearing upon a second contract, the contract now in suit, but it is to some extent made a part of the second contract, and its existence and the work accomplished under it are a portion of the facts and circumstances leading to the last agreement. They are adverted to to show that no purchaser in the world ever better knew, or was more completely bound to know, what he was buying than were the defendants when they entered into the contract of April 12, 1893.
This contract of April 12, 1893, recited much of what had occurred between the parties, and provided that in consideration of the payment of the amount of $96,056.46, before mentioned, the contract of March 21, 1892, should be canceled and annulled; and that the defendants, upon new terms prescribed, should have the right to use the “ Harvey process ” in the manufacture of armor plates for all vessels which Congress had authorized or might thereafter authorize. It also provided that the claimant should hold and save harmless, and *684 at its own risk and expense defend, the United States from and against all and every demand “for or on account of any infringement or alleged infringement of patented rights appertaining to said process.” The terms imposed upon the defendants were that they should pay ‘‘a royalty of one-half of 1 per cent per pound of the finished plate. ”
It was also provided by this contract that 10 per cent of the royalties to be paid should be withheld until the Harvey process ‘ ‘ shall have been tried and found to be efficient, and, in the judgment of the Secretary of the Navy, of satisfactory value.” Under this clause, and a similar one in the preceding contract, 10 per cent had been withheld. But on the 4th of December, 1893, the Chief of the Ordnance Bureau certified to the Secretary of the Navy: “The first Harvey treated plate under the said agreement having been tested, with results demonstrating the satisfactory value and efficiency of the process, and a part of the Maine’s side armor having been set up in the shops and found to be satisfactory, there being no important irregularities due to the application of the process, it is recommended that the reservation referred to bo now paid.”
' The Secretary of the Navy adopted this recommendation and paid the 10 per cent.
After all these things had happened the defendants, on the 15th of Api’il, 1896, without rescinding the still existing contract of April 12, 1893, publicly advertised for proposals for about 6,000 tons of armor plate, to be treated by the “Harvey process.” And they furthermore expressly set forth in this advertisement that: “The prices bid for armor, treated by the Harvey process, must not include anything for roj^alties, as the Department has acquired the right to use said process, and will indemnify the contractor against all claims therefor. ”
In response to this advertisement contracts were entered into on the 1st of June, 1896, with the Bethlehem Iron Company and the Carnegie Steel Company, the advertisement being made a part of each contract. Under these contracts armor plate for two ships of war was manufactured. This armor plate was inspected and tested by officers of the Ordnance Bureau and was accepted and paid for as “armor treated by the Harvey process.” The process employed was *685 precisety the process employed in the previously manufactured armor plates, concerning which the chief of the Bureau had certified to the “satisfactory value and efficiency of the process,” and the Secretary of the Navy had paid the reserved 10 per cent. When the armor plates manufactured by the Bethlehem and Carnegie companies were completed, and delivered, and accepted, and paid for, the claimant’s cause of action certainly was complete. At that time the process was as satisfactory to the Secretary of the Navy as it ever had been; no rival inventor had appeared claiming that it was an infringement of another patent; no court had decided that the patentee “was not legally entitled” to own and contract the exclusive right to the use of the process; ho suit was pending on the 17th of November, 1897, when the claimant demanded payment, in which the validity of the patent was in issue. The royalty was due and pajrable then; the defendants had no defense to interpose at that time, and they can not interpose one of their own subsequent making now.
A plainer case of estoppel never came before a court. The defendants first bound the claimant’s hands by a contract which secured the right to themselves to use the invention and precluded the claimant from prosecuting the manufacturers as infringers. They next closed the claimant’s eyes as against the manufacturers by advertising that the plates to be made were to be treated by the “Harvey process,” and that “the prices bid for armor treated by the Harvey process must not include anything for royalties, as the Department has acquired the right to use said process, and will indemnify the contractor against all claims therefor.” They did not rescind the contract or give a notice which would have put the claimant on its guard, or enabled it to proceed against the manufacturers, but stood silent until the work was done and they had received the fruits of their agreement. Having received every possible benefit that was assured to them by the contract, they now seek to evade its obligations. Their position is that of a man who, to avoid the dangers and costs of an action in trespass or ejectment, enters under a lease and then seeks to evade the payment of rent by assuming the attitude of a wrongdoer and denying his landlord’s title.
*686 The same principle applies to the defense that the armor plates were not manufactured according to the Harvey process, as defined and limited in the patent. The claimant had brought the process to the defendants before it was patented, and they have never been able to obtain the desirable plate except by the use of the process, patented or unpatented. The variations from the patent, if any there were, were trivial — so trivial that they were not known to the manufacturers when they made the plates, or to the defendants’ officers who supervised the making, They were, not discovered by the Ordnance Bureau until after the first work was completed, but they were known to the Bureau when the last work, the work involved in the case, was contracted for as plates to be manufactured by the Harvey process and under the Harvey .patent and in pursuance of the Harvey contract. The process employed did not differ from the process which had been employed for the preceding’ plates. If the defendants conceded that the process which had been employed was the Harvey process, as defined in and secured by the patent, they continued to concede that when^ with all the knowledge which they possess now, they advertised for plates to be manufactured by the Harvey process, and therein adverted to their contract as securing them the right to manufacture under the Harvey patent. The variations from the patented process, if substantial, would have practically stricken down the patent and left the invention valueless. There was but one way in which that issue could be properl}'' tried, and that was by an action for infringement. Instead of misleading the claimant by their advertisement and contracts with the Bethlehem and Carnegie companies, it was the plain duty of the defendants to notify both the claimants and the companies of the new attitude which they intended to assume, and leave the claimant free to fight the battle, of infringement with the manufacturers.
If this agreement did not import a warrantee, it was the duty of the defendants to have investigated the scope and validity of the claimant’s patent before they purchased a right to manufacture under it. But as it does contain a warrantee of a right to manufacture and use, undisturbed, it is incumbent upon them to show that they have been ousted from the *687 purchased right bjr the action of some superior patentee having a higher title, or that they have been disturbed in the exercise of it.
If it should be said that the invalidity of the patent or the exceedingly restricted construction which the defendants seek to place upon it constitute a failure of .consideration, it must be replied that the agreement itself contains a complete refutation of that defense.
A failure of consideration is where a man does not get, in whole or in part, the thing which he has agreed to pay for. The contract in this case provided against that possibility.
After the experimental tests to which the invention had been subjected before any contract was entered into, and after all the work which had been done and accepted under the preceding contract, the second contract, being the contract in suit, expressly provides that 10 per cent of royalties which may become due shall be withheld by the defendants until “ said process shall have been tried and found to be efficient, andin the judgment of the Secretary of the Navy of satisfactory value. ” By this provision the defendants made the Secretary of the Navy the exclusive judge of whether or not there might be found in the future an unforeseen partial failure of consideration; and the claimant agreed to abide by his decision. When the Secretary of the Navy, adopting the recommendation of the Chief of the Ordnance Bureau, decided that the process was “efficient” and “satisfactory,” and that the 10 per cent reserved should be paid, he rendered a decision, irrevocable so far as courts are concerned, that there had been no failure of consideration. That decision, made after the male-ing of the last contract, stands unreversed by the Secretary of the Navy, and can not be questioned by the court.
In a word, this is a case where a man without fraud or misrepresentation entered into a contract; where he received from the other party all that the contract promised him or that he expected to receive; where he kept his mouth closed when he should have spoken, and withheld a defense when he should have interposed it; where, by his silence and his words, he misled the other contracting party and thereby deprived him of his legal right to the adjudication of courts of competent jurisdiction, which adjudication might be favorable to the other *688 party and cause irreparable loss and injury to himself. Such a man is not entitled to set up in an action on the contract the defenses which the defendants’ executive officers have insisted on interposing in this case.
The court has not entered into an examination of the patent; of the construction which should be given to it; of the state of the art; or of any of those questions which would properly be subjects of consideration if this were an action for an infringement. And concerning them no opinion is expressed.
The judgment of the court is that the claimant recover from the defendants the amount of $60,806.45.