Peelle, Ch. J.,
delivered the opinion of the court:
This is a claim for royalties under an express contract by the Harvey Steel Company with the United States for the use of what is known as the “ Harvey process ” in hardening armor plate. The reasoning, arguments, and conclu *312 sions of the court in tbe case between the same parties involving the construction of the same contract, Avherein judgment was rendered in favor of the claimant in a former suit (38 C. Cls., 662, 681), which judgment on appeal was affirmed by the Supreme Court (196 U. S., 310, 313), apply in the present case, and hence little need be said.
In the present case the contention of the defendants and the intervenor is that in the hardening or Harvey process referred to, one of the elements required was the use of sand, a noncarbonaceous material packed in the back of the plates, and that if not so used it can not be contended that the Harvey process was applied by the Midvale Steel Company in the process which it used in hardening the plates under its several contracts with the United States, though in other respects it concedes that the Harvey process was substantially used. Its contention is that it did not use sand. That is to say, that it accomplished the same result without, as had been accomplished with sand; and it may be added that the same result was accomplished without the use of any non-carbonaceous material in the back of the plates by confining the carbonaceous material within the brick box, as set forth in the findings.
The only difference, therefore, between the cases which heretofore went to judgment (one of which was affirmed by the Supreme Court) and the present case is that in the former suits sand was used in the back of the plates, and the question is, Shall this technical change defeat the right of recovery in this case ? We say technical, because the use of sand was not, as a matter of fact, essential to the Harvey process of carbonizing armor plate.
In the first contract, ref erred to in the findings with the Midvale Steel Company the Government gave the company the option of using the Harvey process or any other hardening process which might be satisfactory to the United States; and in the subsequent contracts, as disclosed by the findings, the hardening process was simply .to be satisfactory to the United States, but, as a matter of fact, under all the contracts referred to the Harvey process was used except in the elimination of sand in the back of the plates. As disclosed in the former case (38 C. Cls., 684), contracts were *313 entered into with the Bethlehem Iron Company and the Carnegie Steel Company, and the plates manufactured by those companies were received by the officers of the Ordnance Bureau of the Navy Department and paid for “ as armor treated by the Harvey process,” and, as was said in that case (p. 685)—
“ When the armor plates manufactured by the Bethlehem and Carnegie companies were completed, and delivered, and accepted, and paid for, the claimant’s cause of action certainly was complete. At that time the process was as satisfactory to the Secretary of the Navy as it ever had been. No' rival inventor had appeared claiming that it was an infringement of another patent; no court had decided that the patentee ‘ was not legally entitled ’ to own and contract the exclusive right to the use of the process; no suit was pending on the lYth of November, 1891, when the claimant demanded payment, in which the validity of the patent was in issue. The royalty was due and payable then. The defendants had no defense to interpose at that time, and they can not interpose one of their own subsequent making now.
“A plainer case of estoppel never came before a court. The defendants first bound the claimant’s hands by a contract which secured the right to themselves to use the invention and precluded the claimant from prosecuting the manufacturers as infringers. They next closed the claimant’s eyes as against the manufacturers by advertising that the plates to be made were to be treated by the 4Harvey process,’ and that ‘the prices bid for armor treated by the Harvey process must not include anything for royalties, as the department has acquired the right to use said process, and will indemnify the contractor against all claims therefor.’ They did not rescind the contract or give a notice which would have put the claimant on its guard, or enabled it to proceed against the manufacturers, but stood silent until the work was done and they had received the fruits of their agreement. Having received every possible benefit that was assured to them by the contract, they now seek to evade its obligations. Their position is that of a man who, to avoid the dangers and costs of an action in trespass or ejectment, enters under a lease and then seeks to evade the payment of rent by assuming the attitude of a wrongdoer and denying his landlord’s title.”
Furthermore, as was said in that case (p. 686)—
“ The same principle applies to the defense that the armor plates were not manufactured according to the Harvey process, as defined and limited in the patent. The claimant had *314 brought the process to the defendants before it was patented, and they have never been able to obtain the desirable plate except by the use of the process, patented or unpatented. The variations from the patent, if any there were, were trivial— so trivial that they were not known to the manufacturers when they made the plates, or to the defendants’ officers who supervised the making. They were not discovered by the Ordnance Bureau until after the first work was completed, but they were known to the bureau when the last work, the work involved in the case, was contracted for, as plates to be manufactured by the Harvey process and under the Harvey patent and in pursuance of the Harvey contract. * * The variations from the patented process, if substantial, would have practically stricken down the patent and.left the invention valueless. There was but one way in which that issue could be properly tried, and that was by an action for infringement. „
patent or the exceedingly restricted construction which the defendants seek to place upon it constitute a failure of consideration, it must be replied that the agreement itself contains a complete refutation of that defense. * * * In a word, this is a case where a man without fraud or misrepresentation entered into a contract; where he received from the other party all that the contract promised him or that he expected to receive; where he kept his mouth closed when he should have spoken, and withheld a defense when he should have interposed it; where, by his silence and his words, he misled the other contracting party and thereby deprived him of his legal right to the adjudication of courts of competent jurisdiction, which adjudication might be favorable to the other party and cause irreparable loss and injury to himself. Such a man is not entitled to set up in an action on the contract the defenses which the defendants’ executive officers have insisted on interposing in this case.”
What was there said by this court in the former suit is equally applicable in the present case.
The Supreme Court on appeal, in affirming the judgment of this court (196 U. S., 310, 318), reviews the experiments by the Navy Department as to the value of the process and the several contracts entered into giving the Navy Department the option of purchasing the process upon the payment of a fixed sum for all vessels authorized by Congress up to and including July 19, 1892, and a half a cent a pound on all vessels authorized thereafter, the United States being *315 held harmless from further claims and demands on account of alleged infringement of patented rights appertaining to said process and to furnish full information regarding the composition and application of all improvements which it might make upon said process.
The right to the use of the process was given to the Government, and in response to the contention and defense that the patent was invalid, and for that reason the claimant company was not entitled to receive royalty thereunder, the Supreme Court (p. 316) said:
“The argument is put mainly on the construction of the clause quoted, coupled with the further agreement that the United States ought not to be estopped as licensee to deny the validity of the patent because it is not a vendor but simply a user of the patented article, and therefore has not enjoyed the advantage of a practical monopoly, as a seller might have enjoyed it even if the patent turned out to be bad. This distinction between sale and use, even for a noncompetitive purpose, does not impress us. So far as the practical advantage secured is matter for consideration, whether a thing made under a patent supposed to be valid is used or sold, it equally may be assumed that the thing would not have been used or sold but for the license from the patentee. We regard the clause in the contract as the measure of the appellant’s rights. * * It is argued that the agreement was only to pay for the use of the process covered by the patent named, and that if the meaning of the parties was to cover anything broader than the patent, even what was known in their speech as the Harvey process, that meaning could be imported into the contract only by reformation, not by construction of the contract as it stands. But we are of opinion that this defense also must fail. In the first place, it is not fully open on the record. The findings asked had a different bearing. All that were asked might have been made without necessitating a judgment for the United States as matter of law and the court believed that the difference between patent and process was trivial. But we should hesitate to admit the defense in any event. The argument is that at the time of the contract it was supposed that the heat required for the process was greater than that actually used, that the patent was valid only for a process with the greater heat, and that the contract covers no more than the patent. But the fact that the parties assumed that the process used and intended to be used was covered by the patent works both ways. It shows that they thought and meant that the agreement covered and should cover the *316 process actually used. We think that this can be gathered from the agreement itself apart from the mere supposition of the parties.
a process process.’ It imported the speech of the parties and the common speech of the time into the description of the subject matter. The words Harvey process commonly are put in quotation marks in the first contract, thus emphasizing the adoption of common speech. They mean the. process actually used. The contract states that it is dealing with the same thing that had been the subject of the former agreement. That agreement further identified that subject as a process which was tested at the naval ordnance proving ground. It also identified it, it is true, as a patented process, but if the incompatibility of the two marks is more than trivial, as it was regarded by the court which found the facts with which we have to deal, the identification by personal familiarity and by common speech is more pungent ánd immediate than that by reference to a document couched in technical terms, which the very argument for the United States declares not to have been understood. It is like a reference to monuments in a deed. As we have said, this identification by personal experiment and by common speech is carried forward into the contract in suit. The latter contract manifests on its face that it is dealing with a process actually in use, which requires the communication of practical knowledge and which further experience may improve.”
Did the Midvale Steel Company use the Harvey process; and if not, what process did it use? It is conceded that, eliminating sand, the Harve3r process was used. Sand was not mentioned in the patent as one of the essential elements except as covered by the term “ noncarbonaceous material,” though it is true in illustrating the value of -the Harvey process to the officers of the Government prior to the contract of April 12,1893, sand was used; but, as the findings disclose, any other noncarbonaceous material would have accomplished the same result, though not essential, unless made so by the terms of' the patent. That the same result was accomplished without sand by the Midvale Steel Company is established in this case. Shall this technical variation defeat a recovery? We think not. Of course the defense of infringement or tort is not available to the United States, since by express contract it had the right to the use of the process on any of its vessels, by whomsoever manufactured; and even if we were to assume *317 that the use of the process by the Midvale Steel Company under any of its contracts with the Government was ah infringement it would not avail the Government, since it received the benefit of the process on the vessel so manufactured, and tinder its contract of license is liable to the claimant company therefor, and that, too, with a right of action over against the Midvalle Steel Company for reimbursement. The Government having received the benefit of the process on its vessels under its license can not compel the claimant company to look to the Midvale Steel Company for payment or other redress.
We can not consent that the abandonment of sand — which, as a matter of fact, is not material in the process of carbonizing the armor plate — entitles the Midvale Steel Company to the rights of the claimant as against the Government in the royalties, or any part thereof, when by express contract the Government had agreed to pay the claimant company for the use of the process on all of its vessels by whomsoever manufactured, and by the terms of its contract had informed the Government of its method and process, and afterwards advised the Government, through the manufacturers of such armor plate, that sand might be discontinued, which was presumably known to the Midvale Steel Company.
As was said by the' court in this case on the motion for a new trial (39 C. Cls., 297, 299), “ In the opinion of the court, the contract entitled the defendants to a disclosure of the inventor’s process, to his instructions and assistance in the practical application of the patent, and to use the process, little or much, in whole or in part; ” and, further, that as the defendants have received all they bargained for, they “ are not entitled to set up their deviations, if any, from the specifications of the patent as a defense.”
In view of the prior adjudications of the Supreme Court and of this court upon which we rest the right of recovery, as hereinbefore stated, we deem it unnecessary to pursue the case further, nor do we deem it necessary to review and discuss the authorities cited by counsel respecting the use and infringement of other patents, as the present case must stand or fall on the prior decisions of this and the Supreme Court, as we have said. The rendition of judgment, however, will *318 be suspended until the extent of the amendment to the petition has been determined.

Order for entering judgment May 1, 1911.

The amended petition having been filed respecting the amount of armor plate treated «and delivered, a s shown by the returns from the Navy Department, and the handing down of this opinion having been withheld therefor, the court now orders that judgment be entered in the claimant’s favor on the findings in the sum of $123,467.23.
The intervening petition as to the Midvale Steel Company is dismissed.