AEROVOX CORPORATION v. MICAMOLD RADIO CORPORATION.*

No. 392.

Circuit Court of Appeals. Second Circuit.

Aug. 9, 1937.

Dean, Fairbank, Hirsch & Foster, of New York City (Morris Hirsch and S. A. Demma, both of New York City, of counsel), for plaintiff.

Ward, Crosby & Neal, of New York City (Kenneth S. Neal and Raymond J. McElhannon, both of New York City, of counsel), for defendant-appellant.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Some of the claims of both of these patents which are now relied on were held valid and infringed by this court in Aerovox Corporation v. Concourse Electric Co., Inc., 65 F.(2d) 386, 389, and were also considered in connection with the counterclaim interposed in Ruben Condenser Corporation et al. v. Aerovox Corporation, 77 F.(2d) 266. This opinion is to be read in connection with what we have already said in the two cases mentioned.

In the Concourse Case, supra, we held the cell patent the embodiment of inventive thought which would give it validity

*Writ of certiorari denied 58 S.Ct. 481, 82 L.Ed. —.

for the reason that the changes in electrolytic dry cell structure which Georgiev disclosed included the new idea, that he put into practice, of placing the cartridge in the container with electrical connections between it and the can which would obviate any difference in potential and so eliminate current leakage without the use of any insulation at all between can and the condenser roll or cartridge. There is nothing in the present record to show that the basis upon which we held the patent valid in the previous case was unsound and we adhere to what we then said in that respect. The defendant does not now seek to have the claims in suit held invalid but only so limited that no infringement may be found.

■ Before Georgiev, it was the practice to fill the places between the cartridge and container with pitch or wax to form a seal against the escape of gases and the leakage of electrolyte from the roll. His discard of this insulation is expressly carried into both claims 18 and 19. They are in terms limited to cells having those spaces "substantially devoid of filling composition thereby to facilitate convection currents of air."

The accused cells of the defendant have those spaces filled with insulating material to such an extent that the voids or air spaces around the cartridge are not more than 5 per cent. and, as an expert witness for the plaintiff testified, it is substantially true that such condensers would not get the benefits of the voids whatever they may be. As it was stipulated that evidence in the case of Ruben Condenser Corporation et al. v. Aerovox Corporation, supra, should be treated as a part of this record and the court below thought this fact had been in that case determined adversely to the defendant here, infringement was found. The inadvertent error involved lies in the failure to note that it is only the evidence relating to this defendant's cell structure which shows how this defendant makes its electrolytic cells. As those of this defendant lack a vital element which gives validity to claims 18 and 19 we cannot agree that those claims are infringed.

Claim 11 reads as follows: "An electric condenser comprising a conductive container, a wound electrolytic condenser roll therein and extending longitudinally thereof, a terminal strip protruding from one end of said roll and mechanically joined directly to the wall of said container, said container having an electrical terminal cooperating with said joint, and a binding post through said cover and affixed to the other terminal of said condenser."

Though the absence of space filling between the roll and can is not expressly in this claim as in the others, and for that reason it may well be said that it was designedly drawn more broadly, if the claim is given the breadth its mere language will permit it will lack what in the Concourse opinion was rightly called "the essence of the invention," i. e., lack of space between the roll and can for the outlet of gases and electrolyte. So construed, it would be anticipated and invalid. To avoid that result and follow our reasoning in the former case we must read it on the specifications as limited so as to include the invention disclosed; the omission of insulation that would in a substantial way eliminate voids between the cartridge and container. See Langston Co. v. Continental Container Corporation (C.C.A.) 80 F.(2d) 847. Consequently we find no infringement of claim 11.

### The Electrolyte Patent.

■ Claims 8, 10, and 11 which are relied on cover a method of preparing an electrolyte designed for use in such a cell as that of patent No. 1,789,949. We held all of these claims valid in the Concourse Case, supra. Nothing has now appeared on which to justify a modification of that holding except a patent granted to Edenburg, United States No. 1,924,711, on an application filed before Georgiev. Some attempt has also been made to show anticipation by Ruben's patent, No. 1,891,207, which we held invalid in Ruben Condenser Corporation v. Aerovox Corporation, supra, but in view of what we said in that case we may now disregard Ruben entirely.

At the outset it must be remembered that all of the raw materials used in combination by Georgiev were old in the art. Also that there is nothing novel in the proportions of them as used by him. What advance he made over the prior art lies in his treatment of the materials after he put them together to get ease of impregnation combined with great efficiency under voltages even as high as 600. Ease of impregnation relates to the coating of the paper separator rolled between the metal

sheets of the cartridge. When the electrolyte is of the proper viscosity, immersion of the rolled cartridge in it as a bath will give the desired impregnation, especially when the soaking is done in a partial vacuum. The great efficiency of the condenser at high voltage comes from the chemical combination of the ingredients composing the electrolyte so that the film formed on the foil sheets is thin, and yet highly resistent to voltage breaks. Moreover, an electrolyte which is relatively a good conductor of electricity is desirable, though the attainment of that places greater strain on the film. As water is a good conductor, its entire elimination from the electrolyte is not the best practice.

Georgiev said in his specifications that: "As conducive to a clear understanding of the scope and purpose of the present invention, it is noted that when substantially dry glycerol and boric acid are used as an electrolyte in an electrolytic condenser, the forming time is generally excessive and the resulting formed aluminum electrode condenser will break down at a voltage under 400. The viscosity of the electrolyte renders the condenser bulky and series-connection of two sections and loss in capacity are involved for adaptation to circuits of 500 volts, commonly used in modern radio sets."

Thus he pointed out clearly as disadvantages attendant upon too great viscosity the excessive size of the condenser and the need for two sections connected in series with the resulting loss in capacity where voltages as high as 500 were used.

He also said: "From the standpoint of impregnation of the condenser, it is a more specific object to provide an electrolyte by the use of which this step can be performed with great facility, without the use of costly equipment and with comparatively little labor and which involves no waste whatsoever, the electrolyte left over being capable of, or readily conditioned for, re-use for impregnating successive batches of condensers."

In speaking of the composition of his electrolyte he said:

"An important feature of the invention is the use in the active principle of the electrolyte of a boron radical suitable in the forming of aluminum electrodes, but in a compound having a greatly enhanced dissociation capacity, whereby the chemical reaction is expedited, the resulting

film has a high specific inductive capacity and greatly enhanced capability of withstanding high voltages.

"The compound used is preferably the ammonium salt of glyceryl borate alone or admixed with glyceryl borate itself, or an alkali metal salt of glyceryl borate may be substituted for part or all of the ammonium salt.

"The above electrolyte is normally an oleaginous liquid and it is preferably used with enough water or other thinning fluid, such as methyl alcohol, to bring its viscosity at a temperature of 200 degrees F. down to between 3 and 4.5, as compared with the viscosity of water at 60 degrees F."

He said that the preferable ingredients were boric acid, glycerol, and ammonia, either gaseous or as ammonia water, and gave an illustrative formula saying, however, that the ammonia water or ammonia might be used in much larger, though not in smaller, proportions than those stated; the increase producing more ammonium glyceryl borate and less glyceryl borate in the resultant electrolyte.

Then he said: "By the simple expedient of heating the mixture as above set forth to boiling and continuing until the boiling point at atmospheric pressure is about 130 degrees C. and holding the solution at this temperature for preferably at least five minutes, the preparation of the electrolyte is completed."

Thus far it cannot be said that Georgiev disclosed anything new but boiling for at least five minutes at about 130 degrees C. at atmospheric pressure. This was one of the novel features on which we relied in the Concourse Case, supra, in holding the claims valid. Now it appears that Edenburg boiled in the prior art, though not to attain any critical boiling point, advocating merely heating not in excess of 250 degrees F. Thus Edenburg falls short of anticipating Georgiev in this respect except to make it impossible to claim boiling broadly as invention.

The other novel feature in the patent in suit is the disclosure of critical limits of viscosity. As we said in the opinion in the Concourse Case, supra, in speaking of Georgiev: "It was necessary for him to fix the proper limits of viscosity and to establish the necessity of transforming the raw materials into the end products by boiling. This made a new electrolyte never before used in a dry condenser, one which

for the first time produced a film which would resist voltages of five hundred." In view of what now appears concerning Edenburg, we apparently put unwarranted emphasis upon boiling merely. We further said of Georgiev: "It is enough that he used the earlier materials, known to be appropriate for his problem, in a new way, prescribing the proportions, the preparation by boiling, the needed viscosity. Indeed, it is not strictly true even to say that he used materials ever used before as an electrolyte. In the raw they were old, but his treatment of them resulted in new compounds, not earlier used as an electrolyte at all."

That is to say, Georgiev's electrolyte was new, in that his disclosed boiling process gave to his electrolyte the proper viscosity which was within the limits he fixed preferably as between 3 and 4.5. Moreover, as prolonged boiling during impregnation would increase the viscosity, he taught the art that, as this did not change "the stable chemical composition of the glyceryl borate and its ammonium salt," and as thickening of the electrolyte when its viscosity becomes considerably in excess of 7 for instance, is undesirable for a number of reasons" of which he stated several, the "electrolyte is readily restored to the proper degree of viscosity without impairing its properties for present purposes, by the addition thereto of appropriate quantities of a neutral thinning liquid, such as methanol or acetone, but ordinary faucet water is quite satisfactory and is ordinarily preferred. The viscosity of the electrolyte may thus readily be maintained within the desired limits of 3 and 7, and preferably between 3 and 4.5 and the electrolyte may be used and re-used for impregnation of successive batches of condensers and without waste or impairment of the efficiency of the electrolyte." He also pointed out that excess of water retarded the forming process and made corrosion of the plates or foils more likely, but added that "reasonably satisfactory results are obtained though the electrolyte in the original preparation is boiled for a much less period of time than according to the preferred practice above set forth."

In an affidavit as to certain tests filed in the Patent Office in connection with his application Georgiev stated under oath that "the viscosity of the electrolyte is a vital factor in attaining satisfactory results." And also that he had demonstrated by tests "that, when the electrolyte condensers are produced according to approved practice of Aerovox Wireless Corporation, no result at all useful under a tension of 500 volts is attained unless the electrolyte is heated at least to the boiling point, but when heated to the boiling point though only for a moment, a useful result is obtained which to be sure is improved upon by continuing the boiling in the preferred manner set forth in the patent specification."

With boiling as such now shown to be old (Edenburg) and the use of the raw materials named being old in the art, it is obvious that this claim broadly covers nothing new and can be valid only when words equivalent to "substantially as disclosed" are read into it after the word "method." When that is done, as it should be under well-known principles, the end product is one limited to a viscosity of between 3 and 7 to be derived from mixing the raw materials named in such proportions that, when heated to boiling which is continued to attain a boiling point of about 130 degrees C. at atmospheric pressure and there preferably held for at least five minutes, the result will be attained though maintenance of boiling after the attainment of the required boiling point is optional. As it is clear enough that the application of heat drives off water, both free and that produced by reaction, and that as water is driven off from the stable elements in the composition, whether by less heat comparatively slowly applied or by much heat much quicker, the boiling point will rise, it is apparent that, where the original proportions are like those given in the example in the specifications, boiling point control as used by Georgiev is a fair enough index of final water content which in turn is a decisive factor in determining viscosity. That is made plain by the specifications wherein it is said that the proper limits of viscosity may be maintained during impregnation by adding preferably common faucet water, though two other thinners were mentioned. All we care about at the moment is to show agreement with the contention that boiling point control and viscosity control are interrelated in that, if initially there is present in the mixture, or is added thereafter, water which will be driven off in reaching the stated boiling point, the suspension of boiling five minutes thereafter will leave the electrolyte of the proper viscosity. But it is essential for such interrelation that the original mixture have,

or be supplied with, a water content which will in combination with the stable ingredients leave sufficient thinner in the mixture after the application of Georgiev's boiling point control to keep the electrolyte within his viscosity limits. So it cannot be said that his boiling point control means anything new beyond Edenburg except in so far as it creates in the mixture a degree of viscosity within the disclosed limits which we before held part of his invention. This is, indeed, made perfectly clear by the fact that, while Georgiev's boiling point control, so-called, is given as about 130 degrees C. at atmospheric pressure as the preferred practice, he states that " * * * reasonably satisfactory results are obtained though the electrolyte in original preparation is boiled for a much less period of time. * * *" Edenburg's upper boiling point limit being 250 degrees F. was 121.1 degrees C. and anything below that was permissible regardless of time.

From this it follows that the gist of Georgiev's invention is the boiling of the mixture composed in suitable percentages of well-known raw materials old in use in combination to make an electrolyte in such a way that the end product will be of a viscosity within the critical limits he disclosed. That is now shown to have been his advance beyond the prior art. Only by reading the claims in suit limited by the invention as described in the specifications can we now in view of the new proof give them validity.

They are:

"8. The method of preparing an electrolyte for electrolytic cells, which comprises admixing alkali metal salt having a boron acid radical with a polyhydroxy alcohol and boiling until the free water and some of the water split off by the reaction is vaporized, with a resultant mixture of glyceryl borate with an alkali metal salt of glyceryl borate."

"10. The method of preparing an electrolyte for electrolytic cells, whch consists in admixing boric acid, glycerol and ammonia water and boiling the solution."

"11. The method of preparing an electrolyte for electrolytic cells which comprises subjecting a mixture of boric acid and polyhydroxy alcohol in the presence of an alkali to boiling and continuing until the boiling point at atmospheric pressure is about 130 degrees centigrade."

The defendant is charged with infringement in the preparation of four electrolytes designated as A, B, C, and D in the record. The starting materials differ somewhat one from the other, but each raw mixture may be fairly called the equivalent of Georgiev's, who used only what others had before. These raw mixtures are boiled variously from a low boiling point of 114 degrees C. at atmospheric pressure to a final high cooking temperature of 131 degrees C.; the starting range being from 114 to 118 degrees C. and the final cooking temperature being from 122 to 131 degrees on the same basis. As Georgiev's final cooking temperature is indefinite, being "about 130 degrees C.," of course the defendant's method does include the equivalent of Georgiev's boiling and, were boiling as such patentable, we would not be prepared to say that the claims were not infringed. But, as Georgiev cannot claim boiling broadly and is limited to boiling to the viscosity within the critical limits he set, it is idle to try to put anything upon boiling unrelated to viscosity. Any boiling aids reaction but, as the starting mixtures vary, so must the boiling vary to have the end product of Georgiev's viscosity. That is in reality the constant which distinguishes the electrolyte of the patent from that of the prior art and in turn from the electrolytes of the defendant. The method claims in suit cover the manner of mixing the ingredients named and boiling them to get that new feature. None of defendant's electrolytes come within Georgiev's viscosity range. They are all solids as distinguished from his liquid with its ease of impregnation because of its viscosity of from 3 to 7. Type A of the defendant has a viscosity of 1,500 plus and type B one of 500 plus. The other two fall below Georgiev's lower limit as that of type C is but 2 plus or minus while that of type D only about 2. As the defendant is free to mix and boil despite the patent since that was a part of the prior art and does not mix and boil to produce an electrolyte which comes within Georgiev's critical viscosity limits, it does not invade the range of validity which can be given the method claims in suit.

Decree reversed and bill dismissed.