## AEROVOX CORPORATION v. DUBILIER CONDENSER CORPORATION et al.
### (two cases).

District Court, S. D. New York.
Sept. 15, 1938.

Dean, Fairbank, Hirsch & Foster, of New York City (Morris Hirsch and S. A. Demma, both of New York City, of counsel), for plaintiff.

Edwards, Bower & Pool, of New York City (Clifton V. Edwards and D. Gordon Angus, both of New York City, of counsel), for defendant Dubilier Condenser Corporation.

Darby & Darby, of New York City (Samuel E. Darby, of New York City, of counsel), for defendants Cornell-Dubilier Corporation and Cornell Electric Mfg. Co., Inc.

300

MANDELBAUM, District Judge.

This is a consolidated patent infringement suit. The bill of complaint charges the defendants, Cornell-Dubilier Corporation, Dubilier Condenser Corporation and Cornell Electric Manufacturing Co. Inc. with infringement of Georgiev patents 1,-789,949 and 1,815,758. During the trial, the bill of complaint as against the defendant, Cornell Electric Manufacturing Co. Inc., was dismissed with the consent of the plaintiff. The answer of the defendant, Cornell-Dubilier Corporation contains a counterclaim against the plaintiff, charging it with infringement of Patent Reissue 19,604 issued to Louis Edenburg, assignor to Nova Electric Corporation, and assigned to Cornell-Dubilier Corporation by assignment dated February 11th, 1936.

The patents in suit have been before the courts on numerous occasions and the following citations may be examined for detailed explanation of the patents themselves: Aerovox Corp. v. Concourse Electric Co., 2 Cir., 65 F.2d 386, Ruben Condenser Co. and Mallory Co. v. Aerovox Corp., 2 Cir., 77 F.2d 266, and Aerovox Corp. v. Micamold Radio Corp., 2 Cir., 92 F. 2d 45, certiorari denied 302 U.S. 767, 58 S. Ct. 481, 82 L.Ed. 596.

The decision of the Circuit Court of Appeals in Aerovox Corp. v. Micamold Radio Corp., supra, has narrowed the issues and counsel for both sides have agreed that only the following need be passed upon by the court.

1. Condenser No. 1 (Exhibit 5) which plaintiff claims defendants have infringed on its structure patent No. 1,789,949, and

2. Electrolyte Process CD-1 which plaintiff claims defendants have infringed its process patent No. 1,815,768, and

3. The counterclaim interposed by the defendant, Cornell-Dubilier Corporation which charges that the plaintiff has infringed upon Patent Reissue 19,604, issued to Louis Edenburg and obtained by it through assignment.

The court will consider these in the order named.

### 1. Plaintiff's Structure Patent
### Georgiev No. 1,789,949

The structure patent involves an aluminum can, a condenser unit inside of the can without any filling whatsoever, aluminum terminals and connection of the terminals of the unit within the can, one to the can and one to a central terminal.

The validity of this structure patent has been upheld four times. Twice in the United States District Court, Eastern District of New York (Ruben Condenser Co. v. Aerovox Corp., 7 F.Supp. 168, 178; Aerovox Corp. v. Micamold Radio Corp., 15 F.Supp. 279, 287–289) and twice by our Circuit Court of Appeals (Aerovox Corp. v. Concourse Electric Co., 2 Cir., 65 F.2d 386, 387, 388; Aerovox Corp. v. Micamold Radio Corp., 2 Cir., 92 F.2d 45, 46). It is urged by the plaintiff that admissions of infringement made by counsel for the defendants during the course of the trial, upon condition that the patent was valid, leaves the court no alternative but to grant a decree in favor of the plaintiff on the structure patent.

Irrespective of the fact that the validity of the patent has been sustained, the defendants assume the position that they have established the invalidity of the structure patent by evidence introduced at the trial, which was never before the Circuit Court of Appeals. They predicate their claim of invalidity by reason of three instances of prior public use and complete anticipation of the Georgiev structure patent. The three instances are:

1. Edenburg's specification, Def. Exh. Q (Edenburg was at one time the head of plaintiff's laboratory), and

2. A condenser made by the Dumont Company (installed in a telephone bell set in the Lincoln School, New Rochelle (see S. M. pp. 201, 202, 208, Defts. Exh J. and Z),

3. Two condensers made by the Dubilier Corporation (see S.M. 554–556; 579, def. exh. EE and FF).

The defendants' argument, in the main, may be said to be that Georgiev's patent resides soley in the absence of pitch filling or other substances from the air spaces (see Aerovox Corp. v. Concourse Electric Co., supra, at pages 386, 388), and that therefore the structure patent is invalid because the three instances above cited contain the only concept of Georgiev's held by the Circuit Court of Appeals to be inventive.

Assuming without deciding that the Circuit Court of Appeals has held the absence of pitch or other substances to be the only inventive concept of Georgiev, I believe that an examination of the claims in the Georgiev structure patent, in comparison with the Edenburg specification, the Dumont condenser and the Dubilier condensers

reveal differences sufficient to defeat the claim of prior public use and complete anticipation. The plaintiff has paraphrased the language of the Georgiev claims as well as the one offered by the defendants, and the court sets them forth side by side for comparison:

| Elements of Georgiev's structure patent | Elements of Edenburg, Dumont and Dubilier |
|---|---|
| a. A metallic can *of the same metal* as the metal sheets in condenser roll housed therein; | a. The can is of tin and the electrodes of the condenser roll of aluminum, so that the can was *not* of the same metal as the electrodes. |
| b. One terminal of which is insulated from the can and the other *directly* affixed to the can, and | b. The terminals are both insulated from the can *and neither of them directly* fixed to the can, and |
| c. There being an absence of any filling such as wax, pitch, sand *or anything other than* air between the condenser roll and the can. | c. There was *some filling* either of pitch or wax or sand or felt stuffing, *and not merely air spaces* to separate the condenser unit from the can. |

An examination of the above makes it obvious that Edenburg, Dumont and Dubilier do not contain any of the three elements tabulated under the Georgiev structure patent.

If this is not enough to defeat the defendants' claim of invalidity based upon prior public use and complete anticipation, it is to be observed (and it is not controverted by the defendants) that the Edenburg specifications were before the Circuit Court of Appeals in Aerovox Corp. v. Micamold Radio Corp., supra, and that both the Dumont and Dubilier condensers were substantially like the prior Ruben Patent No. 1,714,191, which in Aerovox Corp. v. Concourse Electric Co., supra, the Circuit Court of Appeals has held to be irrelevant.

I find from the evidence and exhibits that the defendants have failed to sustain the burden of proving prior public use and complete anticipation. See Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821; Diamond Patent Co. v. S. E. Carr Co., 9 Cir., 217 F. 400, 405.

The validity of the Georgiev structure patent having been established by prior adjudications, the plaintiff is accordingly entitled to an injunction and an accounting on condenser No. 1 (exhibit 5) which the court holds infringes the first Georgiev structure patent No. 1,789,949.

## 2. Plaintiff's Electrolyte Patent
### Georgiev No. 1,815,768

The issue on this phase of the suit resolves itself into what is conceded by both sides to be an interpretation of the decision of the Circuit Court of Appeals in Aerovox Corp. v. Micamold Radio Corp., supra. An electrolytic condenser may be defined as one in which the electrode, between the two foils or plates of metal, is treated chemically to cause an oxide of chemical layer on the metal of this plate to form on it and that layer acts as an insulator. The difference between an electrolytic condenser and a condenser of some other type is that in the former, the plate or electrode *is treated chemically* rather than the placing of a separate piece of insulator between the two foils or plates of metal. There is no question about the validity of the Georgiev patent, the same having been upheld by the Circuit Court of Appeals, both in the Concourse and Micamold Cases, supra. What we are concerned with is whether defendants' electrolyte process CD–1 infringes on the plaintiff's patent.

In the Micamold Case, supra, at page 48, the court specifically states what advance Georgiev made over the prior art: "From this it follows that the gist of Georgiev's invention is the boiling of the mixture composed in suitable percentages of well-known raw materials old in use in combination to make an electrolyte in such a way that the *end product will be of a viscosity within the critical limits he disclosed. That is now shown to have been his advance beyond the prior art.*" (Italics by the court.) 92 F.2d 49.

The plaintiff argues that "the finding of the Circuit Court of Appeals in the Micamold Case, supra, definitely determines infringement by defendants' electrolyte CD–1, with its stipulated viscosity of 3.3 to 4.2." Further, "3.3 is slightly above Georgiev's preferred minimum of 3 and 4.2 is slightly above Georgiev's preferred maximum of 4.5. Defendants' viscosity thus comes squarely in the very middle of Georgiev's range. In fact, the average of defendants' CD–1 viscosity between 3.3 and 4.2 is *identically the same 3.75.*"

The defendants counter by stating that the Circuit Court of Appeals did not sustain the Georgiev patent for a precise viscosity. They argue that "it does not make the slightest bit of difference what the viscosity is, and it is only by pure accident

that the viscosity of this one particular condenser is within that range as is illustrated by the fact that all the other condensers charged to infringe at the beginning of the trial, the only difference between them was in this little specific characteristic." The argument summed up in a few words is this: Georgiev's process is specifically directed to an *impregnation* process in which the rolled condenser sections are physically *soaked* in the liquid electrolyte. The process employed by the defendant is not one by impregnation but of *pasting,* in which the electrolyte paste is spread on the spacing strips before rolling them up on the foil to make the condenser section. The argument is an ingenious one. However, I do feel that were I to accept it, I would do violence to the very clear and unambiguous language of the Circuit Court of Appeals. Let us see if the language of the opinion does not bear me out.

Micamold Case, supra, at page 47: " * * * When the electrolyte is of the *proper viscosity,* immersion of the rolled cartridge in it as a bath will give the desired impregnation, especially when the soaking is done in a partial vacuum. * * * The other novel feature in the patent in suit is the disclosure of *critical limits of viscosity."*

At page 48:
"That is to say, Georgiev's electrolyte was new, in that his disclosed boiling process gave to his electrolyte the *proper viscosity* which was within the limits he fixed preferably as between 3 and 4.5.

" * * * the end product is one limited to a *viscosity* of between 3 and 7 to be derived from mixing the raw materials named in such proportions that, when heated to boiling which is continued to attain a boiling point of about 130 degrees C. at atmospheric pressure and there preferably held for at least five minutes, the result will be attained though maintenance of boiling after the attainment of the required boiling point is optional. * * * All we care about at the moment is to show agreement with the contention that *boiling point control* and *viscosity control are interrelated* * * * the suspension of boiling five minutes thereafter will leave the electrolyte of the *proper viscosity".*

At page 49:
"So it cannot be said that his boiling point control means anything new beyond Edenburg except in so far as it creates in the mixture *a degree of viscosity* with-

in the disclosed limits which we before held part of his invention. * * *

"But, as Georgiev cannot claim boiling broadly and is limited to boiling to the *viscosity* within the critical limits he set, *it is idle to try to put anything upon boiling unrelated to viscosity. * * * *"*

And finally: *"None of defendant's electrolytes come within Georgiev's viscosity range."*

(Italics by the court.)

Here is what the court says of impregnation (pages 46, 47): "What advance he made over the prior art lies in his treatment of the materials after he put them together *to get ease of impregnation combined with great efficiency under voltages even as high as 600.* Ease of impregnation relates to the coating of the paper separator rolled between the metal sheets of the cartridge. * * * *The great efficiency of the condenser at high voltage comes from the chemical combination of the ingredients composing the electrolyte so that the film formed on the foil sheets is thin, and yet highly resistant to voltage breaks."* (Italics by the court.)

Webster's New International Dictionary, Second Edition, unabridged, defines impregnation as follows:

3. To infuse an active principle into; *to render fruitful or fertile in any way;* to fertilize; imbue; permeate.

As I see it the novelty in the Georgiev patent was the manner in which he used the composition of well-known raw materials. The method of impregnating the condenser rolls with the finished product (electrolyte) after it had gone through the chemical process described by Georgiev is immaterial. What difference does it make whether the condenser rolls are *impregnated by immersion* into the electrolyte or *impregnated by smearing* the *same electrolyte* on the gauze before rolling up the condenser?

Georgiev did not invent a method of impregnation. What he did create was a *specific method of control* which leads to the production of an electrolyte capable of withstanding voltages as high as 600. This is something which Edenburg and the others versed in the art did not do. The defendants' electrolyte CD–1 being concededly within Georgiev's viscosity range, I therefore hold the same to infringe plaintiff's electrolyte patent (Georgiev No. 1,815,768)

and the plaintiff is accordingly granted an injunction and an accounting.

### 3. The Edenburg Counterclaim

The plaintiff has set up six separate defenses to the counterclaim interposed by the defendant, Cornell-Dubilier Corporation. The basis of the counterclaim, to repeat what I said at the outset, is that the plaintiff infringed the said defendants' Patent Reissue 19,604 issued to Louis Edenburg, assignor to Nova Electric Corp. and assigned to the defendant, Cornell-Dubilier Corporation by assignment dated February 11, 1936.

A chronology of the events leading up to the interposition of the counterclaim will prove to be helpful in determining the issue before the court. In 1928 Louis Edenburg, the patentee of the patent, which is the subject of the counterclaim, was in the employ of the plaintiff. On March 9th, 1928, Edenburg and one Katzman, his partner, entered into a license agreement with the plaintiff for one year, in which plaintiff was given the right to construct condensers according to the Edenburg process. At the expiration of one year, an attempt was made to negotiate a renewal of the said agreement but the same fell through. The reason assigned by the plaintiff for the failure to renew was the alleged impracticability of the Edenburg process and its inadaptability to commercial production. Thereafter, Georgiev supplanted Edenburg and the former's process (Patent 1,815,768) apparently proved successful because of the ability of the condenser to withstand high voltages. See Aerovox Corp. v. Micamold Radio Corp., supra.

In 1930, the Nova Electric Corp., which owned the Edenburg patent, sued the plaintiff in the New York Supreme Court for royalties on plaintiff's production subsequent to the expiration of the renewal contract. This suit resulted in a settlement upon payment of royalties amounting to $775 to the Nova Electric Corp. in exchange for a general release to the plaintiff.

The preamble in the release is significant. It reads: "Whereas, the parties hereto desire to release one another from any and all rights, claims and obligations arising from said agreement, and from the alleged invention or inventions described therein and from *any and all Letters Patent which may have been or may be obtained thereon*". While I doubt whether the preamble read together with the commonly used release clause itself is sufficiently broad to release future infringements, it, however, becomes important on the factual question as to what was intended by the parties and the effect of the release on their future conduct. It appears further that during the course of this litigation which finally culminated in the release, Katzman, who was a party to the license agreement, attended examinations before trial brought on by the Nova Electric Corp. in which the plaintiff's representative disclosed the Georgiev process which the plaintiff was employing. The defendant denies that such disclosure was made, but I am satisfied from the evidence that there was enough of a disclosure to put the Nova Electric Corp. on notice. If the Georgiev process, as disclosed to Nova Electric Corp. was then infringing upon the Edenburg patent, it is difficult to believe that the settlement would have been consummated for the sum of $775. Another link in the chain of events appears in the course of a suit between Katzman against Georgiev in the latter part of 1935, where pursuant to a stipulation, Katzman's attention was called to the general release above referred to and which stipulation read in part: "for a complete release for all part and future claims under said application or any patent issued thereon".

Again, nothing was said nor done with respect to any infringement of the Edenburg patent by Aerovox. This, to me, seems to indicate that either Aerovox was not infringing or else the parties were of the belief that the release theretofore executed precluded them from asserting any possible rights, even if there was an infringement. Additional factors persuade me that that is so. The Dumont Company (operating company for Edenburg and his partner, Katzman) was an active competitor of the plaintiff, and I suppose that it is logical to assume that one competitor knows all about another competitor's business. Therefore, it is difficult to believe that if such infringement was taking place that the Dumont Company would not have, in some manner, shape or form, taken steps to protect its rights. The conclusion is irresistible, that either there was no such infringement or that the Dumont Company recognized that the release barred the assertion of any rights against Aerovox on the Edenburg patent.

From 1933, when the Edenburg patent issued, up to 1936, we find this continuous silence and acquiescence. It is uncontradicted that no notice of infringement, written or oral, was ever given to the plaintiff dur-

ing the years mentioned. No action was ever taken by Edenburg or his privies to contest the Georgiev patent in the Patent office, either by an Interference Suit or some other procedure. All these circumstances lead me to believe that after the execution of the release by Edenburg and Katzman, to Aerovox, the plaintiff herein, Edenburg, Nova Electric Corp. and The Dumont Company were living in peace with the plaintiff. Nothing happened after the issuance of the Edenburg patent on August 29th, 1933 to change this situation. But suddenly, *after the commencement of the present suit,* the defendant, Cornell-Dubilier Corp., acquired the Edenburg patent by an agreement executed November 12, 1935. Without going into detail as to the terms of this license agreement, suffice to say that it provided that the defendants' assignor, Nova Electric Corp. reserved the right to terminate the agreement and call for a reassignment of the patent, after 12 months, if Cornell-Dubilier Corp. has neither granted licenses nor taken steps to institute suits on such patent within a period of 12 months.

I am reluctant to characterize this license agreement as champertous, as has been urged upon the court by the plaintiff, but I do feel that enough has been adduced from all the surrounding circumstances to warrant the denial of any equitable relief to the defendant, Cornell-Dubilier Corp. on its counterclaim. I am of the opinion that Edenburg and his privies have estopped themselves from claiming that the Georgiev patent infringes the Edenburg patent.

The following statement appearing in the case of Kittle v. Hall, C.C., 29 F. 508, 511, appears to me to be peculiarly applicable to the situation at bar. The court, in the course of its opinion, said: "Long acquiescence and laches can only be excused by proof showing excusable ignorance, or positive inability to proceed on the part of the complainant, or that he is the victim of fraud or concealment on the part of others. A mere 'imaginary impediment or technical disability' is not enough. The court will not entertain a case when it appears that the complainant, or those to whose rights he has succeeded, have acquiesced for a long term of years in the infringement of the exclusive right conferred by the patent, or have delayed, without legal excuse, the prosecution of those who have openly violated it. These propositions are, it is thought, abundantly sustained by the following authorities: [cases cited]."

The counterclaim is dismissed. A consideration of the other defenses interposed to the counterclaim is therefore unnecessary.

Submit decree on notice, in accordance with this opinion, together with findings of fact and conclusions of law as provided by Rule 70½ of the Equity Rules, 28 U.S.C.A. following section 723.