## AEROVOX CORPORATION v. CORNELL-DUBILIER CORPORATION.
### No. 123.

Circuit Court of Appeals, Second Circuit.

Jan. 8, 1940.

Samuel Ostrolenk and Isidor J. Kresel, both of New York City (Isidor J. Kresel, Samuel Ostrolenk, Wm. Peyton Marin, and S. Michael Pineles, all of New York City, of counsel), for appellant.

Dean, Fairbank & Hirsch, of New York City (Morris Hirsch and S. A. Demma, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

Claims six, seven and eight were in the original patent; nine, ten, eleven and fourteen were added by reissue; all are for a process of making an electrolytic condenser. The plaintiff's processes, which are said to infringe these claims, are four in number, and the first three are precisely the same as to the mix for the electrolyte, which is about 43% ethylene glycol, 47½% boric acid, and 9½% aqua ammonia (26% C. P.). The plaintiff heats this under atmospheric pressure until it becomes a clear solution at between 230° and 240° F. It then immerses the rolled condenser sections in the solution, the dielectric film having been already "preformed" upon the aluminum foil. The "clear solution" is then raised to a higher temperature, at which it is kept for five minutes, after which it is allowed to cool to 180° F., and kept at that heat for between one and four hours. The only difference between the three processes is the temperature to which the "clear solution" is raised and kept during the first five minutes after the sections are put into it, and which determines the voltage resistance of the condenser. The first process calls for 270° F. and the dielectric film resists up to 240 volts; the second calls for 280° F. and the film resists up to 510 volts; the third calls for 285° F. and the film resists up to 550 volts. The mix of the fourth process is made of glycerin and ammonium borate, half and half, to which an unmeasured quantity of water is added. As in the other processes the dielectric film is formed upon the aluminum foil before the condenser sections are rolled, and, indeed, in some cases the "spacer" is impregnated separately, merely as a fabric. Here too the temperature determines the voltage resistance. The liquid is heated till it becomes a "clear solution" at between 230° and 240° F., after which the section, or the "spacer", is put in, and the temperature raised to 240° F. for "motor starting" condensers up to 110 volts; to 252° F. for other kinds of condensers up to 200 volts, and to 260° F. for higher voltages. All this takes place at atmospheric pressures.

Claim six reads as follows: "An electrolytic condenser comprising a plu-

rality of strips of fibrous material interleaved with a pair of strips of aluminum foil; the method of impregnating the assembly in a hot liquid electrolytic mixture composed solely of glycerine and borax and electrolytically forming a dielectric film on one of said strips." Claims seven and eight are in substance the same, except for the added element, "expelling the surplus liquid by compression", which refers to the following passage in the disclosure, page one, column two, lines 48–52: "The impregnation may last for two hours, and after it is finished the condenser is squeezed and compressed enough to expel any surplus of liquid impregnating material". The plaintiff does not do this, and does not infringe these claims for that reason; we cannot disregard the element just quoted, since it is the only difference between these claims and claim six. As to that claim, it would be verbally enough to escape infringement that the plaintiff preforms the "dielectric film on one of said strips" before it puts the condenser into the impregnating bath; but if that were the only difference, it would be an extraordinarily narrow claim which could be so avoided, and arguendo, we shall assume the contrary. The claim does not, however, cover any of the processes, because the electrolyte is not "composed solely of glycerine and borax". Borax is sodium borate, and, for the purposes here in question, sodium borate is the equivalent of chemically pure ammonium borate; just as ethylene glycol is the equivalent of glycerin. Moreover, boric acid will combine with aqua ammonia to form ammonium borate. Nevertheless, the first three processes do not infringe, because the evidence is uncontradicted that the aqua ammonia is not present in large enough quantity to take up all the boric acid radicals in the resulting salt, ammonium borate; there remain free borons, which are boric acid. The plaintiff adds this excess quite deliberately, because it promotes drying of the mix. Nor does the claim cover the fourth process, in which the electrolyte contains only ammonium borate and glycerin. If the ammonium borate were chemically pure perhaps it would; but the plaintiff's expert, Waterman, testified without contradiction that "the ammonium borate of commerce is a stable salt", and that "about the only salt stable at room temperature" was a complex molecule, whose formula he gave. Of such substances he said: "there are

two ammonias in them, and for the hypothetical ammonium borate two borons would be necessary. As a result there is an excess of 8 boron radicals, which would correspond to 8 molecules of boric acid present, in excess of that necessary to satisfy the ammonia. In other words, the ammonium borate is a substance which has a large excess of boric acid in it". Since the defendant had the burden of proof upon the issue of infringement, this testimony is conclusive unless we disregard the word, "solely", under the doctrine of equivalents. This we should not do.

The original application, filed January 25, 1928, contained eight claims of which only one—claim five—survived as claim one. In it and in three others the electrolyte was indeed to be made of glycerin and borax, as it was in three more added on June 24, 1929, and in one or two introduced later still. However, on April 14, 1931, Edenburg inserted the word, "solely", to avoid the examiner's citation of several patents, in which the electrolyte disclosed contained other elements. Such an amendment is alone quite enough to forbid our disregarding the addition, even if there were no art which would make the claim invalid if we did. There is. Ruben's application, which resulted in Patent No. 1,891,206, he filed more than six months before Edenburg filed his; and, while Edenburg made a feeble effort to carry back his date, it was so transparent a pretence as to deserve no discussion. Since therefore Ruben's No. 1,891,206 is prior art, the only chance of survival for claim six is in the word, "solely", for Ruben had otherwise exactly the same electrolyte. His mix was "boric acid crystals, borax crystals and glycerin" (page one, lines 53, 54); this was to be a "molten solution at about 200° F." (lines 51, 52), kept at that temperature, "a vacuum being then applied after the occluded gases are exhausted" (lines 55–57). Thus, if claim six is valid at all, which we do not decide, the plaintiff does not infringe it.

The four claims in suit, which were introduced on reissue, are in two pairs—nine and ten, and eleven and fourteen. The first pair is for the process of mixing glycerin and an alkali borate, and heating it to "250° F." (claim nine); or, "in the order of 250° F." (claim ten). Now the disclosure mentioned temperature only once (page 1, lines 38–43), and then only as a caution against going too high. It read

as follows: "To permit the glycerin and borax solution to permeate the condenser more quickly and thoroughly, the impregnation may be done in a vacuum and the solution may be heated preferably to a temperature not over 250° F." Literally at least, that meant only that for sure impregnation it was desirable to heat in a vacuum, but not above 250° F.; it did not mean that any heat whatever was necessary to the formation of the electrolyte; and that also appeared from another passage (page 2, lines 24–30) where both heating and vacuum were left out. Moreover, as it read, the caution was quite useless, for to heat the mix to 250° F. in a vacuum of, say, 27 inches, was equivalent to heating to 460° F. at atmosphere, and that would produce too viscous an electrolyte. On their face claims nine and ten were apparently not for such a process at all; they said nothing about vacuum, and would normally presuppose atmospheric pressure, though, if so, literally they contradicted the disclosure, which, as we have just said, used the copula in line 41. If we read a vacuum as implied, as some of the defendant's testimony appears to assume, they are, however, invalid for, as we have said, not only do they tell nothing useful, but they set a limit which would be destructive. Indeed, as the defendant's own expert, who apparently read them in this way, averred, it was a "cut and try method"; and such a method amounts to no more than the quite valueless suggestion that one should never go beyond 250° F. with or without a vacuum.

■ ■ If on the other hand they can be read as meaning atmospheric pressure, they would be anticipated by Ruben's No. 1,891,206 unless the mix were "solely" of glycerin and borax. It is true that Ruben's initial temperature was only 200° F., but that was to be kept up after a vacuum was established, and would certainly become the equivalent of at least 250° F. at atmospheric pressure, and might be more. This is confirmed by the fact that as late as July, 1928,—six months after he had filed his application—Edenburg told the plaintiff that the mix should be heated to 200° F. in a vacuum, a method differing from Ruben's only in the absence of any excess of boric acid. Finally, if the invention is to be tortured into holding the heat to the equivalent of 250° F. at atmospheric pressure, it is no advance over Ruben, for one of the plain-

tiff's processes goes to 285° F. In general, temperature is a function of resistance, and was to be determined by experiment; 250° F. meant nothing. The defendant may take either horn of the dilemma it prefers; if the claims are to read strictly upon the disclosure, they are invalid, because they tell nothing, and are indeed positively misleading; if they are to be read as speaking for atmospheric pressure, they do not cover the plaintiff's processes, for Ruben would anticipate them, if they did.

Claims eleven and fourteen were substantially alike; each substituted for 250° F. the phrase, "a predetermined temperature to provide the necessary viscosity for impregnating the condenser", which meant merely that one should heat the mix until it becomes viscous enough to serve as an electrolyte. If heating alone were new, conceivably that might be enough; there are discoveries which the art can be left to apply by trial and error; and it might be argued that heating the mix to promote impregnation was one of these. But, as we have seen, heating was not new; Ruben at least was earlier. We did not hold in Aerovox Corp. v. Micamold Radio Corp., 2 Cir., 92 F.2d 45, that Edenburg was the first to "boil" the mix, as the defendant keeps insisting. We did say that he anticipated Georgiev as to "boiling" simpliciter, but to twist that into a holding that "he is entitled to the broad monopoly of boiling point control", is absolutely without warrant, and the statement would have been patently untrue, if we had made it. If Edenburg invented anything, it was an electrolyte which contained no excess of borons; the claims, as first issued, covered that invention, if it was an invention; but claims eleven and fourteen, even if read with that limitation, are invalid. That contribution was indeed apparently valueless; certainly he was able to give no useful information to the plaintiff. Nevertheless, we need not decide that all his claims are invalid, and we will not do so. Nor need we decide the validity of those defences, based upon the transactions between the parties, which the judge held good. We hold that claims eleven and fourteen are invalid, and that the plaintiff has not infringed claims six, seven, eight, nine and ten.

Decree affirmed.