NATIONAL WELDING EQUIPMENT CO., a corporation, Plaintiff,

v.

HAMMON PRECISION EQUIPMENT COMPANY, a corporation, George L. Hammon, an individual and Clifford P. Stuebgen, an individual, Defendants.

No. 36121.

United States District Court
N. D. California, S. D.

Sept. 17, 1958.

As Amended Sept. 30, 1958.

Marshall E. Leahy, John F. O'Dea, Naylor & Neal, James M. Naylor, Frank. A. Neal, San Francisco, Cal., for plaintiff.

Flehr & Swain, Paul D. Flehr, John F. Swain and Harold C. Hohbach, San Franciso, Cal., for defendants.

ROCHE, District Judge.

This suit is based on two causes of action: (1) patent infringement and (2) unfair competition. The subject matter of this suit is gas pressure regulators, which are devices for reducing the pressure of compressed gas in cylinders to operating levels suitable for such

activities as oxy-acetylene welding, the administering of anesthetics, and oxygen therapy.

Defendant George L. Hammon invented the three mechanical structures and the two designs which are the basis of the five patents in suit. He assigned the inventions and the respective patent applications to his employer, National Welding Equipment Co. (hereafter called National). On February 12, 1955, due to a change in National's management, Hammon was dismissed from his position as vice president and general manager of National, although he continued as a director. Three and one-half months later, on June 1, 1955, Hammon organized his own company, Hammon Precision Equipment Company (hereafter called Hammon Precision), to manufacture and sell gas pressure regulators and other apparatus. At about this time, defendant Clifford P. Stuebgen, a close friend of Hammon who was superintendent and treasurer of National and also a director, resigned from his job at National to become an employee of Hammon Precision. Both Hammon and Stuebgen continued as directors of National until March 9, 1956, when two other men were elected to represent their shares. Hammon and Stuebgen still own a substantial number of National's shares.

### Patent Infringement

Plaintiff alleges infringement of United States Letters Patent Nos. 2,597,478 (split-skirt seat carrier), 2,597,479 (leather-like insert), and 2,685,300 (dust-cap adjusting handle) and United States Design Letters Patent Nos. D–153,063 (single-stage regulator) and D–153,064 (two-stage regulator). Plaintiff contends that Hammon, as the patentee-assignor of the five patents in suit, is estopped to contest the validity of these patents when sued for infringement by the assignee, National.

Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 1924, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Douglass v. U. S. Appliance Corp., 9 Cir., 1949, 177 F.2d 98. Plaintiff also contends that the estoppel in the case at bar extends to defendants Stuebgen and Hammon Precision as privies of Hammon, the patentee-assignor. Douglass v. U. S. Appliance Corp., supra; Buckingham Products Co. v. McAleer Mfg. Co., 6 Cir., 1939, 108 F.2d 192; accord, American Machinery Co. v. Everedy Machine Co., D.C.E.D.Pa.1929, 35 F.2d 526. Therefore, plaintiff contends, none of the defendants may assert that the patents in suit are invalid; the sole issue to be determined is the question of infringement.

Defendants deny infringing the five patents in suit and also assert that these patents are invalid because of prior public use.[1] To support their contention that an assignor may attack the validity of his assigned patent, defendants rely on Scott Paper Co. v. Marcalus Mfg. Co., 1945, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47. In that case, the Supreme Court held that an assignor is not estopped because of his assignment from showing that his accused device follows a prior art expired patent. The assignor was permitted to show that the expired patent was identical with the assigned patent, thereby reducing the latter's claims to naught.

Defendants contend that the policy of not according patent protection to public domain inventions which permits a challenge to validity based on following the prior art also permits a challenge to validity based on prior public use. They contend that a device used publicly more than one year before applying for letters patent is as much in the public domain as a device covered by an expired patent. See Welch v. Grindle, 9 Cir., 1957, 251 F.2d 671. If a device is in the public domain, the superior public

1. 35 U.S.C. § 102 states: "A person shall be entitled to a patent unless—

\* \* \* \* \*

"(b) the invention was patented or described in a printed publication in this

or in a foreign country or in public use or sale in this country, more than one year prior to the date of the application for patent in the United States,

\* \* \* "

interest in its unrestricted use precludes the assignee from asserting a limited monopoly of the device by means of an estoppel growing out of the patentee's assignment. Scott Paper Co. v. Marcalus Mfg. Co., 1945, 326 U.S. 249, 255–256, 66 S.Ct. 101.

The court agrees with defendants. As said in Douglass v. U. S. Appliance Corp., 9 Cir., 1949, 177 F.2d 98, 101:

"* * * [Scott Paper Co. v. Marcalus Mfg. Co. brings] into the foreground the public interest in the free exploitation and distribution of appliances not truly the subject of a patent monopoly, relegating judicial concern as respects private good faith to an undefined and shadowy, but certainly a secondary, place."

Plaintiff has cited Buckingham Products Co v. McAleer Mfg. Co., 6 Cir., 1939, 108 F.2d 192, Universal Rim Co. v. Scott, D.C.N.D.Ohio 1922, 21 F.2d 346, and Hurwood Mfg. Co. v. Wood, C.C.Conn. 1905, 138 F. 835,[2] but the court is of the opinion that both Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 1924, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316, and Scott Paper Co. v. Marcalus Mfg. Co., 1945, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, indicate a trend in the law favoring defendant's contention.

Turning to the evidence of prior public use, the record shows that devices embodying the structure known as the split-skirt seat carrier were sold by National to the United States Navy in 1945. These devices were pre-set regulators, part of a portable emergency cutting unit known as the Pak Kut outfit, which was to be used by men trapped in compartments of ships under water. Since an application for a patent for the split-skirt seat carrier was not filed until March 11, 1947, Patent No. 2,597,478 which issued from that application clearly is void because of public use of the invention disclosed therein more than one year prior to the date of application. 35 U.S.C. § 102(b) (1952).

Further evidence of prior public use, with respect to all three of the mechanical structures as well as the two designs, is as follows. At the end of World War II, Hammon, in an effort to use up surplus regulator parts and to add to National's line of welding equipment, designed a two-stage adjustable gas pressure regulator for National to produce commercially. This model incorporated the split-skirt seat carrier, the leatherlike insert, the dust-cap adjusting handle, and the design later patented for both single-stage and two-stage models. Hammon assembled a small quantity of these regulators and toured the industry, offering them for sale. On a trip to Stuart Oxygen Company, he left two two-stage regulators to be tested and demonstrated to the company's salesmen by the head of Stuart's service department. These regulators were left with Stuart Oxygen Company before February 18, 1946 and never returned to Hammon or to National.

If an inventor gives or sells to another a device embodying the inventor's invention, without limitation or injunction of secrecy as to its use, and the device is so used, such use is public even though the use is confined to one person. Egbert v. Lippmann, 1881, 104 U.S. 333, 26 L.Ed. 755; accord, Welch v. Grindle, 9 Cir., 1957, 251 F.2d 671. The record shows a complete relinquishment of the regulators to Stuart Oxygen Company prior to February 18, 1946. Such use was not of an experimental nature which would still permit a valid patent to be issued. See Paraffine Companies, Inc., v. McEverlast, Inc., 9 Cir., 1936, 84 F.2d 335. Since patent applications for two of the mechanical structures and the two designs were not filed until March 11, 1947, and for the third mechanical structure until December 9, 1948, all of the mechanical structures

---

2. Harvey Steel Co. v. United States, 1903, 38 Ct.Cl. 662, affirmed 1905, 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; Spinney v. Allen, 1928, 127 Me. 7, 140 A. 688, and Hook v. Hook & Ackerman, Inc., 1953, 375 Pa. 278, 100 A.2d 374, are distinguishable on their facts.

and the patentable design features were in public use more than one year before the filing of patent applications. Therefore, the court concludes that all of the five patents in suit are void. 35 U.S.C. § 102(b) (1952).

■ The record also shows that none of the patents in suit has been infringed by defendants' structures or designs. Plaintiff has the burden of proof of infringement. Tropic-Aire, Inc., v. Auto Radiator Mfg. Co., 7 Cir., 1938, 96 F.2d 345; National Machine Corp. v. Benthall Machine Co., 4 Cir., 1916, 241 F. 72. The record shows that plaintiff has failed to sustain this burden.

### No. 2,597,478 (split-skirt seat carrier)

■ Patent No. 2,597,478 discloses the use of a split-skirt seat carrier in the valve mechanism of a gas pressure regulator. The end of the valve piston opposite the seat end is slitted, and the portions between the slits act as individual springs to engage the side walls of a cylindrical sleeve. The friction created by this engagement eliminates undesirable buzzing, singing, or chattering when the regulator is in operation. Claim 1 of the patent contains the following limitation:

"  *   *   * the wall forming the recess on the other end of the piston having *a plurality of narrow, open-end slits* extending in from said other end to give radial resiliency to said wall portions.   *   *   *"

Claim 2 of the patent contains the following limitation:

"  *   *   * said piston having *a plurality of axial relatively narrow slits* through its wall.   *   *   *"

The evidence shows that the seat carrier in defendants' regulators has no slits but utilizes an old construction in which outwardly bowed lengths of piano wire are mounted on the outer surface of the seat carrier to engage resiliently the side walls of the sleeve.

■■ According to Claims 1 and 2 of the patent, narrow slits in the seat carrier are a material part of the patent-ed structure. Such limitations cannot be ignored. See Richmond Screw Anchor Co. v. Umbach, 7 Cir., 1949, 173 F.2d 521, certiorari denied, 1949, 337 U.S. 919, 69 S.Ct. 1161, 93 L.Ed. 1728. Moreover, when there is an express limitation in a claim, there can be no application of the doctrine of equivalents if the accused device departs from the claim in that particular. Aerovox Corp. v. Cornell-Dubilier Corp., 2 Cir., 1940, 108 F.2d 749; Dillon Pulley Co. v. McEachran, 6 Cir., 1934, 69 F.2d 144.

### No. 2,597,479 (leather-like insert)

■ Patent No. 2,597,479 describes the construction of an adjustment mechanism for a gas pressure regulator in which an adjusting screw engages a spring button by riding against a leather-like insert in the spring button. Claim 1 of the patent, as corrected, contains the following limitations:

"  *   *   * a rigid member on the end of said spring and a bearing member of non-metallic material *having leather-like qualities supported thereon* and engaged by the *end of said adjusting screw."*

Claim 2 of the patent contains the following limitations:

"  *   *   * *a recessed rigid bearing supporting member* on the end of said spring and *a leather disc in said recess* engaged by the end of said adjusting screw."

Claim 3 of the patent contains the following limitations:

"  *   *   * *a recessed rigid bearing supporting member* between said spring and said screw, and *a leather-like bearing in the recess* in contact with said screw."

The evidence shows that defendants' regulators utilize nylon, a hard material which does not have leather-like qualities, that the nylon is in the form of a conical tip on the adjusting screw, that the nylon tip is not supported by the spring button, that the adjusting screw with its nylon tip bears directly against a prior art brass spring button, and

that there is no insert in the spring button.

The court has considered the many authorities which plaintiff has cited in connection with the leather-like insert patent.[3] Claims must be read in the light of the specifications, the patent's history, and the prior art. Dillon Pulley Co. v. McEachran, 6 Cir., 1934, 69 F.2d 144; Grubman Engineering & Mfg. Co. v. Goldberger, 2 Cir., 1931, 47 F.2d 151. So read, the claims of the leather-like insert patent do not cover the mechanical structures found in defendants' devices.[4]

### No. 2,685,300 (dust-cap adjusting handle)

Patent No. 2,685,300 relates primarily to the use of an adjusting handle of such length that it can be screwed into engagement with the body of the regulator to keep dust away from the adjusting screw. Claim 1 of the patent contains the following limitations:

> " * * * said adjusting screw projecting substantially beyond said adjusting screw housing and having *a tool receiving groove* in its outer end for effecting adjustment thereof, and a dust-protecting cap including a base portion *threadedly engaging* said adjusting screw outwardly of said adjusting screw housing for axial adjustment relative thereto and a skirt portion having *a free edge engageable with said wall* upon axial adjustment of the cap. * * * ""

Claim 2 of the patent contains the following limitation:

> " * * * *a second portion of reduced diameter* in substantially close surrounding relation to a portion of said adjusting screw housing. * * * *"

Claim 3 of the patent contains the following limitation:

> " * * * an inner portion having V-threads and an outer substantially longer portion having *square threads*. * * * *"

The evidence shows that defendants' regulators do not infringe these claims because the adjusting screw has no tool receiving groove, the adjusting handle does not threadedly engage the adjusting screw but has a broached opening to cooperate with flattened surfaces on the adjusting screw, the adjusting handle is too short to engage the body of the regulator, the adjusting handle has no portion of reduced diameter as in Claim 2, and the adjusting screw has no square threads as in Claim 3.

3. Ry-Lock Co. v. Sears, Roebuck & Co., 9 Cir., 1955, 227 F.2d 615, certiorari denied, 1956, 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854, is not in point because it is concerned with appellate review of as much evidence as the trial judge had before him, namely, the paper patents. Oxnard Canners, Inc. v. Bradley, 9 Cir., 1952, 194 F.2d 655, certiorari denied, 1952, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370; Bianchi v. Barili, 9 Cir., 1948, 168 F.2d 793; Williams v. Kaufmann, 9 Cir., 1919, 259 F. 859; Simplex Window Co. v. Hauser Reversible Window Co., 9 Cir., 1918, 248 F. 919, and City of Grafton, W. Va. v. Otis Elevator Co., 4 Cir., 1948, 166 F.2d 816, are not in point because they deal with insignificant mechanical changes in the accused structures which do not vary their mode of operation from that of the patented structures. Jonas v. Roberti, 9 Cir., 1925, 7 F.2d 563 and Los Angeles Lime Co. v. Nye, 9 Cir., 1921, 270 F. 155, are distinguishable on their facts.

4. Plaintiff also contends that defendants' regulator adjusting mechanism is a mere reversal or transposition of parts and therefore infringes Claim 1. The doctrine of reversal of parts is not applicable where the precise form disclosed is important to the invention, American Seating Co. v. Ideal Seating Co., 6 Cir., 1941, 124 F.2d 70, or where the accused structure performs an additional function which is not found in the patented structure, Kenyon v. Automatic Instrument Co., D.C.W.D.Mich.1950, 89 F.Supp. 602, affirmed, 6 Cir., 1951, 186 F.2d 752. The record shows that the precise form of the invention was important in prosecuting the application for the leather-like insert patent and that defendants' regulator adjusting mechanism performs a centering function not shown in the leather-like insert patent.

Nos. D–153,063 and D–153,064 (single-and two-stage regulators)

■ Design Patents Nos. D–153,063 and D–153,064 cover the designs for plaintiff's single- and two-stage regulators. The evidence shows that these design patents are not infringed. In Gorham Mfg. Co. v. White, 1871, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731, the Supreme Court held:

"* * * [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." 14 Wall. 511, 528, 81 U.S. 511, 528.[5]

The record discloses that gas pressure regulators are not sold to the average man in the street but to purchasing agents for manufacturing companies and hospitals. The court is of the opinion that no ordinary observer, giving such attention as a *purchaser* of these regulators usually gives, would be induced to purchase defendants' regulators supposing them to be plaintiff's.

Unfair Competition

Plaintiff's principal allegation of unfair competition is that defendants misappropriated plaintiff's trade secrets. The evidence shows that both Hammon and Stuebgen, while employed at National, kept a set of production drawings at home for safekeeping in case of fire destroying the set kept at the plant. These production drawings are used in making tools and checking the parts produced by them. After Stuebgen resigned from National to work for Hammon Precision and while Hammon Precision was getting into production, Stuebgen copied about one-half of the National drawings in his custody, tracing the outlines of certain parts, to make a set of production drawings for Hammon Precision. Both Hammon's and Stuebgen's sets of National's drawings were returned to National on June 21, 1955, following National's request for them.

■ Plaintiff has not shown defendants to have dealt with anything that was in fact secret. The record discloses that the information contained in National's production drawings was not preserved by National as a trade secret. See Ernst Slide Fastener Co. v. Stamberg, Sup.1953, 120 N.Y.S.2d 311. Since National's regulators had been on the market for many years, there could be no trade secrets in the production drawings of the parts of the regulators. Cf. Mycalex Corp. of America v. Pemco Corp., D.C.Md.1946, 64 F.Supp. 420, affirmed, 4 Cir., 1947, 159 F.2d 907. Moreover, any secrets disclosed in a patent application fall into the public domain when the patent issues. Schreyer v. Casco Products Corp., D.C.Conn. 1951, 97 F.Supp. 159, modified, 2 Cir., 1951, 190 F.2d 921; accord, Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 1949, 172 F.2d 150. Plaintiff has also failed to show that Stuebgen's copying gave defendants any substantial headstart in their business venture. Therefore, considering the limited nature of the copying, the nonsecret nature of what was copied, and the absence of proof of damage, the court concludes that plaintiff's principal allegation of unfair competition falls.

■ Plaintiff alleges unfair competition in that defendant Hammon, both before and after his dismissal from National, persuaded a number of plaintiff's key employees who possessed confiden-

---

5. Later cases cited by plaintiff do not add to this statement of the law. E. g., Sel-O-Rak Corp. v. Henry Hanger and Display Fixture Corp. of America, 5 Cir., 1956, 232 F.2d 176, certiorari denied, 1956, 352 U.S. 870, 77 S.Ct. 95, 1 L.Ed. 2d 76; Sears Roebuck & Co. v. Talge, 8 Cir., 1944, 140 F.2d 395; Vacheron & Constantin-LeCoultre Watches, Inc., v. Benrus Watch Co., D.C.S.D.N.Y.1957, 155 F.Supp. 932.

tial information to leave plaintiff's employment and join defendants. The record discloses that defendant Stuebgen was a close friend of Hammon and left National of his own choice to continue his working association with Hammon. Hammon Precision's office manager, Gerben Dekker, was discharged from National before he could resign. There is no evidence that the other employees of National who left after Hammon's discharge and ultimately became employees of Hammon Precision were enticed away from National by Hammon. None of these employees was under an employment contract with National. Defendants offered them better jobs, and the employees accepted. This does not constitute unfair competition. Richard M. Krause, Inc., v. Gardner, Sup.Ct.1950, 99 N.Y.S.2d 592. Plaintiff likewise has failed to establish that these employees possessed confidential information. The evidence shows that plaintiff's methods, processes, and . customers are matters of general knowledge in the industry. Therefore, defendants will not be enjoined from using this information. Richard M. Krause, Inc., v. Gardner, supra.

Plaintiff alleges that defendants competed unfairly by producing and selling colorable imitations of plaintiff's devices, copying both functional and nonfunctional features to mislead the public. The evidence discloses that, while Hammon was vice president and general manager of National, he and Dr. Hudson of Hudson Oxygen Therapy Sales created a special "Hudson design" to be used on medical regulators manufactured by National for Hudson Oxygen Therapy Sales. This customer design was a modification of several of the design features invented by Hammon which had been incorporated into the two design patents in suit and embodied in the medical and industrial regulators manufactured by National. With this special design, Dr. Hudson was permitted to sell his regulators (manufactured by National) within the territory of a regular National distributor. The record shows that

Hammon, who was still with National at the time, and Dr. Hudson understood that the Hudson design belonged to Dr. Hudson.

In June 1955, following Hammon's discharge from National, Dr. Hudson gave Hammon permission to use the Hudson design for the gas pressure regulators which Hammon was going to make through his own company. At this time, Dr. Hudson gave Hammon two Hudson regulators as samples of what Dr. Hudson wanted Hammon Precision to make for him. The record shows that Hammon proceeded to modify the Hudson design and make changes in the internal mechanism to avoid interfering with the three mechanical patents in suit. Hammon then exhibited the reworked regulators to the trade as prototypes of what Hammon Precision would make.

The identical imitation of the goods of another does not in itself constitute unfair competition. West Point Mfg. Co. v. Detroit Stamping Co., 6. Cir., 1955, 222 F.2d 581, certiorari denied, 1955, 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749; accord, Haeger Potteries,. Inc., v. Gilner Potteries, D.C.S.D.Cal. 1954, 123 F.Supp. 261. "The privilege to engage in business and to compete with others implies a privilege to copy or imitate the physical appearance of another's goods. The public interest in competition ordinarily outweighs the interest in securing to a person the rewards of his ingenuity in making his product attractive to purchasers." Restatement, Torts, Introductory Note to §§ 741–43 (1938).

The functional features of plaintiff's regulators are not protected by patent or registered trade-mark. Plaintiff has failed to establish that these features have acquired any secondary meaning; on the contrary, the evidence shows that they are found in gas pressure regulators made by various companies. Therefore, defendants' copying of the functional features is privileged. Nims, Unfair Competition and Trade Marks, § 134 (4th Ed. 1947).

With respect to the non-functional features, the record shows that most of the gauges for gas pressure regulators are manufactured by one company, U. S. Gauge; that the use of certain colors, such as green for oxygen and red for acetylene, is standard in the industry; that equipment in the industry has standardized connections which require standardized fittings on gas pressure regulators; and that it is a common practice in the industry to mark regulators with the name of the distributor rather than the name of the manufacturer. The evidence also shows that Hammon's discharge from National was swiftly communicated to the industry, that Hammon personally toured the industry when offering Hammon Precision regulators for sale, that Hammon Precision's so-called Emeryville-type regulator (the principal accused structure in the unfair competition aspects of this suit) was only made for a few months, and that Hammon Precision does not engage in direct selling, as does National, but sells only to distributors. Since the record is bare of any evidence of actual customer confusion as to source of goods and plaintiff has failed to establish the substantial likelihood of such confusion, the court concludes that defendants' copying of the non-functional features is privileged. Chun King Sales, Inc. v. Oriental Foods, Inc., D.C.S.D. Cal.1955, 136 F.Supp. 659, modified 9 Cir., 1957, 244 F.2d 909; American Fork & Hoe Co. v. Stampit Corp., 6 Cir., 1942, 125 F.2d 472. Plaintiff cites Thayer Telkee Corp. v. Davenport-Taylor Mfg. Co., D.C.S.D.N.Y.1930, 46 F.2d 559 and Wesson v. Galef, D.C.S.D.N.Y.1922, 286 F. 621, but these cases are not in point because they deal with such wholesale copying of non-functional features that there is substantial likelihood of confusion of source.

Plaintiff alleges that defendants competed unfairly by representing to the public that defendants' devices are the same as National's and that the parts of the devices are fully interchangeable. Plaintiff has failed to establish that regulators manufactured by Hammon Precision were thus represented. As for interchangeability of parts, the record shows that Hammon Precision supplied Stuart Oxygen Company with replacement and repair parts lists for Hammon Precision regulators. Since Stuart Oxygen Company had been handling National regulators prior to this time, Stuart made up a price list to acquaint its salesmen with the new regulators of Hammon Precision. These price lists listed and compared various sizes of Hammon Precision regulators with the corresponding sizes of National regulators so that the Stuart sales force would know what catalog numbers to use in ordering regulators from Hammon Precision. Such a list does not imply that Hammon Precision regulators are identical with National regulators. The fact that some of the parts are interchangeable does not by itself support a charge of unfair competition, considering the extensive state of the prior art, the nature of the industry, and the need for standardized parts and fittings to comply with safety codes. Therefore, the court concludes that this allegation of unfair competition falls.

Plaintiff's last allegation of unfair competition is that defendants disparaged National's management and financial condition to its customers. On this matter, the record is silent. The record does show, however, that former customers of National such as Stuart Oxygen Company, Hudson Oxygen Therapy Sales, and Southern Oxygen Company began to purchase from Hammon Precision only after their relations with National had become impaired. According to the testimony, National could no longer guarantee quality or service and had begun to sell directly to customers of these three companies. The court is of the opinion that the cause of National's loss of business was customer dissatisfaction with National's operations subsequent to Hammon's dismissal and that no unfair competition in this regard can be attributed to defendants.

Plaintiff's complaint is hereby dismissed. A judgment shall be entered in favor of defendants and against plaintiff declaring that the five patents in suit are invalid because of public use of the inventions disclosed therein more than one year before the filing of patent applications and declaring that defendants have not infringed any or all of the five patents in suit. An injunction shall be issued in favor of defendants and against plaintiff restraining plaintiff from harassing and intimidating defendants, their customers, and their suppliers in any manner. All parties shall bear their own costs and attorney's fees. Defendants shall prepare findings of fact and conclusions of law in accordance with this opinion.

And it is so ordered.